# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LSI DESIGN AND INTEGRATION CORP., Individually and On Behalf of All Others Similarly Situated, | ) )<br>) **Case No. 18-cv-12352-LTS**<br>) |
| Plaintiff, | )<br>) **CONSOLIDATED AMENDED CLASS** |
| v. | ) **ACTION COMPLAINT**<br>) |
| TESARO, INC. LEON O. MOULDER, JR., and TIMOTHY R. PEARSON, | ) **JURY TRIAL DEMANDED**<br>) |
| Defendants. | )<br>) |

## CLASS ACTION COMPLAINT

Plaintiff LSI Design and Integration Corp. ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Consolidated Amended Class Action Complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tesaro, Inc. ("Tesaro" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities other than Defendants who purchased or otherwise acquired Tesaro's common stock between November 4, 2016 through November 14, 2016, both dates inclusive (the "Class Period"). Plaintiff seeks to recover damages

caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Tesaro was an oncology-focused biopharmaceutical company that identified, acquired, developed, and commercialized cancer therapies and oncology supportive care products in the United States and Europe.  Throughout its history, Tesaro never generated a profit, and exclusively relied on more than a billion dollars raised through public and private offerings of common stock and equity, convertible notes and term loan financing to operate as a going concern. In July 2016, the Company raised $408.9 million from a secondary offering of common stock.

3.      In 2016, Tesaro commercialized only one US Food and Drug Administration ("FDA") approved product known as Varubi® (oral).  Varubi is intended to prevent nausea and vomiting associated with initial or repeat courses of chemotherapy administered to treat cancer patients.  The Company recognized $4.4 million in Varubi sales in the first nine months of 2016.

4.      During the Class Period, the Defendants materially misled investors to believe that the Company had sufficient funds from its existing balance of cash, including the July 2016 secondary offering, as well as from sales of Varubi to fund the Company's existing operations and cash flow requirements for the next twelve months.  Defendant Leon Moulder ("Moulder"), Tesaro's Chief Executive Officer ("CEO") during the Class Period, went a step further and provided investors with the following brazen assurance about the Company's operations in Europe: ***"VARUBI itself though can pretty much cover over time all of our expenses."*** (Emphasis added).

5.      The Defendants, however, knew and had access to information that severely undermined their claims regarding the commercial prospects of Varubi.

6.   According to a former Tesaro sales representative responsible for providing Varubi to physicians, cited in this complaint as Confidential Witness 1 ("CW1"), the Defendants knew that the oral formulation of Varubi failed to meet the Company's sales expectations during the Class Period because the Company sold only 53% and 67% of its targeted sales goal in the second and third quarter of 2016 respectively.

7.   Confidential Witness 2 ("CW2"), Tesaro's former senior manager of sales operations, confirms that the Defendants received monthly updates on the Company's sales figures, and discussed sales results and strategy during monthly corporate leadership team meetings.

8.   Even though Tesaro raised over $400 million from the July 2016 secondary offering and assured investors on November 8, 2016 that the Company had sufficient cash from this offering and Varubi sales to fund its existing operations and satisfy its cash flow requirements, Tesaro abruptly announced three business days later, on November 14, 2016, that the Company would commence another secondary offering of 1,750,000 shares of its common stock (the "November Offering").

9.   In the early morning hours of November 15, 2016, a respected analyst/journalist who focuses on the life sciences and biotechnology industries announced on Twitter that shares in the November Offering would be set at a significantly discounted price due to low investor demand.

10.   Later that morning, Tesaro issued a press release, announcing that the offering price for the November Offering would be $135.00 per share, approximately *9%, lower* than the closing price of $148.50 per share on the previous trading day, November 14, 2016.

11.   Following these announcements, Tesaro's share price plunged $17.46 per share, or roughly 11.76%, to close at $131.04 on November 15, 2016, wiping out approximately $607

million in shareholder value.  The Company's stock price continued to decline significantly the following day, and closed at $126.65 a share on November 16, 2016, on heavy trading volume.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

15.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Tesaro's principal executive offices are located within this Judicial District.

16.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

17.     Plaintiff, as set forth in the previously attached Certification (Dkt. No. 1-1), acquired Tesaro's securities at artificially inflated prices during the Class Period and was damaged upon the disclosure and/or materialization of the risks concealed by Defendants' Class Period misrepresentations and omissions.

4

18.     Defendant Tesaro is incorporated in Delaware, with its principal executive offices located at 1000 Winter Street, Waltham, Massachusetts.  Tesaro's securities trade on the NASDAQ under the ticker symbol "TSRO".

19.     Defendant Moulder has served at all relevant times as the Company's CEO and Director.

20.     Defendant Timothy R. Pearson ("Pearson") has served at all relevant times as the Company's Chief Financial Officer ("CFO") and Executive Vice President.

21.     The Defendants referenced above in ¶¶ 18-20 are sometimes referred to herein collectively as the "Individual Defendants."

22.     The Individual Defendants possessed the power and authority to control the contents of Tesaro's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

**Background**

23.     Tesaro is an oncology-focused biopharmaceutical company that identifies, acquires, develops, and commercializes cancer therapies and oncology supportive care products in the United States.  The Company was founded in March 2010 by Defendant Moulder and Mary

Lynne Hedley, the Company's current President and Chief Operating Officer, and completed its Initial Public Offering in 2012.[1]

24.     Throughout its history, Tesaro required hundreds of millions of dollars a year in cash to fund its existing operations, and had a burn rate of over a hundred million dollars a quarter towards the end of 2016.   Analysts, however, emphasized Defendants' assurances that the Company was able to fund its existing operations and meet its cash flow requirements.   On November 4, 2016, SunTrust Robinson Humphrey noted in an analyst report on Tesaro's reported balance of cash being sufficient to withstand risks like competition in the market for ovarian cancer therapies and losing ground in the immuno-oncology space.

25.     To fund its operations, the Company has almost exclusively relied on public and private offerings of common stock and equity, the issuance of convertible notes and term loan financing to operate as a going concern.   Since 2010, the Company has raised $1.4 billion in proceeds from public offerings and private placements of common stock and convertible preferred stock, and in particular, raised $408.9 million from the secondary public offering of common stock in July 2016.

26.     The oral formulation of Varubi was Tesaro's only FDA approved product during the Class Period.

27.     Varubi was approved by the FDA in September 2015, and Tesaro began to recognize revenues on sales from Varubi in the United States in the fourth quarter of 2015.

28.     During the early November 2016 Class Period, Defendants told investors that the current balance of cash on hand and revenues generated from Varubi were sufficient to meet the Company's then existing cash flow requirements for the next twelve months.

---

[1] Tesaro was acquired on January 22, 2019 by GlaxoSmithKline plc.

29.     Following the commercialization of the oral formulation of Varubi in the United States, the Company recognized $0.2 million of net product revenue for the three months ended March 31, 2016, $1.4 million of net product revenue for the three months ended June 30, 2016, and $2.8 million of net product revenue for the three months ended September 30, 2016.  For the year ended December 31, 2016, the Company ultimately recognized only $5.174 million derived from Varubi sales.

30.     During the Class Period, however, Defendant Moulder repeatedly conditioned the market by boasting that Varubi would be the dominant drug in the market for antiemetic agents, and that it would become the market leader as early as the end of the fourth quarter of 2016.  On November 3, 2016, the day Tesaro announced financial results for the third quarter of 2016, Defendant Moulder boasted to the market:

> Turning to VARUBI, we have now completed our third full quarter of commercialization of oral VARUBI in the U.S., and we continue to receive excellent feedback from clinicians regarding the benefit of this product, has provided to certain other patients who received emetogenic chemotherapy regimens for the treatment of breast, lung, ovarian and other cancers. As part of our launch plan, our focus remains on establishing the use of oral VARUBI within those clinics that have an in-office dispensing or IOD pharmacies.
>
> ***Over 5,100 commercial doses of VARUBI were provided during the third quarter, with unit volume growth of 14% sequentially for the third quarter compared to the second quarter. We ended the quarter with a VARUBI share of approximately 28% of the oral NK-1 market in the U.S. and intend to exit 2016 with the largest market share in this category.***

31.     Defendants, in fact, knew that the oral formulation of Varubi was never going to drive the Company's revenues because the oral formulation of the drug could, at best, capture only ten percent of the U.S. market.  Moreover, while touting to the market "growth of 14% sequentially," Defendants misleadingly failed to disclose the truth that sales had failed to hit the Company's targets by forty seven percent and thirty three percent in the second and third quarter

of 2016 respectively.  Furthermore, while Defendants missed their own internal targets, which generated a little more than four million dollars from Varubi sales in the first three quarters of 2016, Merck & Co.'s Emend®, Varubi's competitor, earned $549 million in 2016.

**Confidential Witness Accounts Confirm the Material Falsity of Defendants' Statements**

32.     CW1 is a former Area Manager who worked at Tesaro from August 2015 to August 2018.  CW1 described an Area Manager as the functional equivalent of a sales representative. CW1 was responsible for sales of Varubi in five major cities spread across the state of California. As an Area Manager, CW1 was responsible for selling the oral formulation of Varubi in California. According to CW1, Tesaro did not directly sell Varubi to medical providers.  Instead, CW1 stated that Area Managers educated medical providers on the pertinent facts related to the medication, and medical providers would then acquire Varubi from specialty pharmacies.

33.     CW1 recalled that Tesaro tracked each sales representative's success by generating reports on each Varubi order and linking that report to a particular sales representative.

34.     CW1 stated that the Company knew that it was in trouble when Varubi sales before the beginning of the Class Period were less than the sales targets established internally. Specifically, CW1 explained that the Company sold only 4,481 units of Varubi in the second quarter of 2016 compared to a national sales goal of 7,705 units, and sold only 5,103 units of Varubi in the third quarter of 2016 compared to a national sales goal of 7,594 units.  In other words, based on CW1's firsthand account, Defendants knew well before the early November Class Period that the Company sold only 53% and 67% of its targeted sales in the second and third quarter of 2016 respectively.  These crucial facts were withheld from investors when Defendants touted the Company's ability to fund existing operations based on its then-current cash position plus Varubi sales. The facts were further omitted from the materially misleading statements made by

Defendants that Varubi was a blockbuster drug that would dominate the market for antiemetic drugs within two months, *i.e.,* the end of 2016.

35.     CW1 specified that some regions, including CW1's, were significantly below the targeted number for sales, as CW1's region only achieved 15% of its targeted sales.

36.     CW2 is a former senior manager of sales operations who worked at Tesaro from December 2014 to June 2018.  CW2 reported to the Director of Sales Operations and Business Informatics.  As a senior manager of sales operations, CW2 was responsible for the effectiveness of the Company's sales strategy and programs.  CW2 specifically provided support, administration, maintenance and management of the Company's suite of field enablement tools.  The field enablement tools included applications that were installed on the sales teams' Apple iPads that tracked sales data.  CW2 directed territory alignment for more than one hundred regions, and assessed the efficacy of applications that were utilized daily by Tesaro's sales staff, area managers, medical science liaisons, oncology nurses and market access teams.  CW2 described CW2's primary role as one that provided direct support to the Company's most senior executives.

37.     CW2 stated that Tesaro and the Individual Defendants never expected the oral formulation of Varubi to drive the Company's revenue despite the Defendants' materially false and misleading statements to investors that stated otherwise.

38.     CW2 further asserted that Defendants Moulder and Pearson received monthly updates on the Company's sales figures and discussed those results during monthly corporate leadership team meetings.  According to CW2, the Company's Director of Sales Operations, Irina Burmenko, performed sales analysis on a daily basis, and the results of this analysis were directly provided to Defendants Moulder and Pearson, and discussed by these Defendants in monthly corporate leadership meetings.  CW2 also explained that Burmenko's commercial operations

group presented sales analysis and data to Defendants Moulder and Pearson during a meeting held each month at the Company's headquarters in Waltham, Massachusetts.

**Materially False and Misleading Statements Issued During the Class Period**

39.     The Class Period begins on November 4, 2016, the day that Tesaro filed a quarterly report for the quarter ended September 30, 2016.  In Tesaro's Form 10-Q for the third quarter of 2016, Defendants made the following materially false and misleading statements regarding the Company's then existing liquidity position and cash flow requirements to fund the Company's existing operations:

> We will require additional capital for the continuing commercialization of VARUBI, further development and potential commercialization of our other product candidates, including any license payments or milestone obligations that may arise, required costs relating to our research collaborations, and cash interest obligations related to our Convertible Notes.  We may also need additional funds to pursue our strategy of in-licensing or acquiring additional product candidates and to meet our obligation to repay the Convertible Notes at maturity or, at our election, upon conversion.  ***Our balance of cash and cash equivalents as of September 30, 2016, and the cash we expect to generate from sales of VARUBI, are expected to be sufficient to meet our existing cash flow requirements and fund our existing operations at their currently planned levels through at least the twelve months following the filing of this Quarterly Report on Form 10-Q.***

40.     The statements identified in paragraph 39 were materially false and misleading when made because (a) Tesaro's balance of cash and cash equivalents was not sufficient to fund the Company's need to expend hundreds of millions of dollars to develop Varubi IV and other cancer therapies over the next twelve months, (b) Varubi sales for the second and third quarter of 2016 were significantly below Tesaro's own internal targets, (c) Varubi's failure at that time to meet the Company's sales expectations made it utterly unreasonable and implausible for Varubi sales to meaningfully fund the Company's operations over the next twelve months, and (d) Tesaro and the Individual Defendants had planned to raise hundreds of millions of dollars in another secondary offering as early as within the next ten days because they knew that the Company's

balance of cash and cash equivalents and sales from Varubi were insufficient to meet the Company's cash flow requirements and fund the Company's existing operations through the next twelve months.

41.     The Q3 2016 10-Q was signed by Defendants Moulder and Pearson, in their respective capacities as (i) CEO and (ii) Executive Vice President and CFO, "pursuant to the requirements of Section 13 or 15(d) of the" Exchange Act.

42.     In addition, the Q3 2016 10-Q appended certifications by the Individual Defendants, pursuant to the Sarbanes-Oxley Act of 2002, stating that "[t]he information contained in the [Q3 2016 10-Q] fairly presents, in all material respects, the financial condition and results of the operations of the Company."

43.     On November 8, 2016, Defendant Moulder attended the Credit Suisse Annual Healthcare Conference in Scottsdale, Arizona.   At the Credit Suisse Annual Health Care Conference, Defendant Moulder made the following materially false and misleading statements regarding Tesaro's ability to fund its operations over the next twelve months:

> . . . So over the next 12 months or so, we anticipate four launches in the U.S. and in Europe and clinical data, obviously, around our immuno-oncology pipeline and additional trial strategies being implemented for niraparib.
>
> And we finished up the third quarter with almost $650 million in cash. So we're well positioned to take this forward.

44.     The statements identified in paragraph 43 were materially false and misleading when made because (a) Tesaro was not "well positioned" to fund its existing operations and meet the Company's cash flow requirements based on Varubi sales and the Company's balance of cash and cash equivalents, and (b) Defendants omitted to disclose to investors that they intended to raise hundreds of millions of dollars in another secondary offering as early as within the next three business days at the time this statement was made.

45.     At the Credit Suisse Annual Health Care Conference, Defendant Moulder also made the following materially false and misleading statements regarding Varubi's ability to funds the Company's operations in Europe in response to questions about scaling the Company's business:

> **<Q - Alethia Young>**: Great. And I want to do I-O at least for about eight minutes. So I got two minutes to ask those questions which is international expansions. So, you're up beyond like – is this [ph] the speed (14:24) that you guys can take on? How do you think about kind of scaling the business there?
>
> **<A - Leon O. Moulder>**: Yeah. I think we're quite enthusiastic about the possibilities here. Obviously, for us, ***VARUBI alone would not have been really an economically sensible thing to do in Europe. VARUBI itself though can pretty much cover over time all of our expenses. So, from that point forward, anything else we put into the sales force is really economic leverage.*** And with the NOVA results – and remember, NOVA, the primary investigator is from Europe, ENGOT was our partner for the trial, ESMO is where the data was first presented. So, there is great enthusiasm in Europe for niraparib, and obviously, we're going to leverage that.

46.     The statements identified in paragraph 45 were materially false and misleading when made because (a) Tesaro's balance of cash and cash equivalents was not sufficient to fund the Company's need to expend hundreds of millions of dollars to develop Varubi IV or other cancer therapies over the next twelve months, (b) Varubi sales for the second and third quarter of 2016 were significantly below Tesaro's own internal targets, (c) Varubi's failure at that time to meet the Company's sales expectations made it utterly implausible that the Company relied on Varubi sales "to cover over time all of our expenses" as Defendant Moulder recklessly misrepresented, and (d) Tesaro and the Individual Defendants omitted to disclose to investors that they intended to raise hundreds of millions of dollars in another secondary offering as early as within the next three business days at the time this statement was made.

**The Truth Begins to Emerge**

47.     After the market closed on November 14, 2016—just ten days after the filing of the

Q3 2016 10-Q—Tesaro issued a press release entitled "TESARO Announces Proposed Public

Offering of Common Stock."  The press release states, in relevant part:

> WALTHAM, Mass., Nov. 14, 2016 (GLOBE NEWSWIRE) -- TESARO, Inc.
> (NASDAQ:TSRO) announced today that it has commenced an underwritten public
> offering of 1,750,000 shares of its common stock. In connection with this offering,
> TESARO plans to grant the underwriters an option to purchase up to an additional
> 262,000 shares of its common stock. Citigroup, Leerink Partners, Credit Suisse and
> Wells Fargo Securities are acting as bookrunners for the offering. The offering is
> subject to market conditions, and there can be no assurance as to whether or when
> the offering may be completed, or as to the actual size or terms of the offering.
>
> The offering will be made by TESARO pursuant to its automatic shelf registration
> statement on Form S-3 filed with the Securities and Exchange Commission (SEC)
> on June 30, 2016.

48.     That same day, Tesaro filed a Prospectus for the November Offering on Form

424B5 with the SEC.

49.     In the early morning hours of November 15, 2016, Adam Feuerstein, the national

biotech columnist for STAT, a media company owned by the Boston Globe that focuses on

journalism about life sciences and biotechnology, announced the following on Twitter regarding

investor demand for Tesaro's November 2016 offering:

.



Adam Feuerstein ✔
@adamfeuerstein                          Follow ⌄

$TSRO - I'm hearing investor demand light
for stock offering announced last night.
Pricing closer to $135 than $140, speculates
my source.

4:41 AM - 15 Nov 2016

50.    On the same day, Tesaro issued a second press release, entitled "TESARO Announces Pricing of Public Offering of Common Stock."  The press release states, in relevant part:

> WALTHAM, Mass., Nov. 15, 2016 (GLOBE NEWSWIRE) -- TESARO, Inc. (Nasdaq:TSRO) announced today that it has priced an underwritten public offering of an aggregate of 1,750,000 shares of its common stock at an offering price to the public of $135.00 per share. The gross proceeds from the offering will be approximately $236.3 million. In addition, TESARO has granted the underwriters an option to purchase up to an additional 262,500 shares of its common stock. TESARO estimates that the net proceeds from the offering will be approximately $224.1 million after deducting the underwriting discount and other offering expenses payable by TESARO, but excluding any exercise of the underwriters' option.

51.    The offering price of $135.00 per share was roughly 9% lower than the closing price of Tesaro stock on the previous trading day, $148.50.

52.    Following these announcements, Tesaro's share price plunged $17.46 per share, or roughly 11.76%, to close at $131.04 on November 15, 2016, wiping out approximately $607 million in shareholder value.

53.    The Company's stock price continued to decline significantly the following day, and closed at $126.65 a share on November 16, 2016, on heavy trading volume.

54.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

55.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Tesaro securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein,

the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

56.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Tesaro securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Tesaro or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

57.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

58.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Tesaro;

- whether the Individual Defendants caused Tesaro to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Tesaro securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

60.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

61.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Tesaro securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Tesaro securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

62.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

63.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

66.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Tesaro securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Tesaro securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

17

67.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Tesaro securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Tesaro's finances and business prospects.

68.     By virtue of their positions at Tesaro, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

69.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Tesaro, the Individual Defendants had knowledge of the details of Tesaro's internal affairs.

70.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Tesaro.  As officers and/or directors of a publicly-held company, the Individual Defendants had a

duty to disseminate timely, accurate, and truthful information with respect to Tesaro's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Tesaro securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Tesaro's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Tesaro securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

71.     During the Class Period, Tesaro securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Tesaro securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Tesaro securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Tesaro securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

72.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

73.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

74.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

75.    During the Class Period, the Individual Defendants participated in the operation and management of Tesaro, and conducted and participated, directly and indirectly, in the conduct of Tesaro's business affairs.  Because of their senior positions, they knew the adverse non-public information about Tesaro's misstatement of income and expenses and false financial statements.

76.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Tesaro's financial condition and results of operations, and to correct promptly any public statements issued by Tesaro which had become materially false or misleading.

77.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Tesaro disseminated in the marketplace during the Class Period concerning Tesaro's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Tesaro to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Tesaro within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Tesaro securities.

78.     Each of the Individual Defendants, therefore, acted as a controlling person of Tesaro.  By reason of their senior management positions and/or being directors of Tesaro, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Tesaro to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Tesaro and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

79.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Tesaro.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

trial by jury of all issues that may be so tried.

Dated:  April 1, 2019

Respectfully submitted,

*/s/ Daryl Andrews*

**ANDREWS DEVALERIO LLP**
Glen DeValerio (BBO# 122010)
Daryl Andrews (BBO# 658523)
265 Franklin Street, Suite 1702
Boston MA 02110
Telephone: (617) 936-2796
Email: glen@andrewsdevalerio.com
        daryl@andrewsdevalerio.com

***Liaison Counsel for Lead Plaintiff***
***and the Proposed Class***

**POMERANTZ LLP**
Patrick V. Dahlstrom
Omar Jafri
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com
        ojafri@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        jlindenfeld@pomlaw.com

***Lead Counsel for Lead Plaintiff***
***and the Proposed Class***

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 1, 2019, a true and correct copy of the foregoing was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>*/s/ Daryl Andrews*   </u>
Daryl Andrews