# EXHIBIT C

**S&P Global**
Market Intelligence

# Tesaro, Inc.

# Company Conference Presentation

**Tuesday, November 08, 2016 3:30 PM GMT**

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

**1**

# Table of Contents

Call Participants ................................................................ 3

Presentation ................................................................ 4

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Call Participants

**EXECUTIVES**

**Leon O. Moulder**
*Co-Founder*

**Mary Lynne Hedley**
*Co-Founder*

**ANALYSTS**

**Alethia Rene Young**
*Crédit Suisse AG, Research Division*

**Unknown Analyst**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Alethia Rene Young**
*Crédit Suisse AG, Research Division*

Hey, guys. It's Alethia Young, large-cap biotech analyst here at Crédit Suisse. It's very happy to have TESARO here with me this morning. We have Leon Moulder, CEO; Dr. Mary Lynne Hedley, who is the President, COO and co-Founder.

We'll have a fireside chat here with TESARO, and if you want to ask questions about TESARO, I have -- you can shoot me an e-mail, alethia.young@credit.suisse.com. We'll do some Q&A at the end in the room if you want it as well. So with that -- thanks, guys, for -- thank you so much.

Thanks, guys, for joining us today. And maybe I'll kick it over to Lonnie. I mean, it's been an exciting year. Lots have come down, and we're still not done. So maybe you can kind of frame the year for us, frame where you think you guys are going over the next 12 months as well?

**Leon O. Moulder**
*Co-Founder*

Sure. First of all, thank you for hosting us here, and we'll be making some forward-looking statements throughout the discussion today. So I will just refer people to our SEC filings.

Obviously, it's been a momentous year for the company. Although since the founding of the company in 2010, each year has been quite significant for us. Right now, if anyone had the opportunity to listen in on our call -- our third quarter call, we have a lot in the works with the recent successful NOVA trial of niraparib in recurrent ovarian cancer that has us preparing for 4 launches: the launch of niraparib in the U.S. in the first half of next year; the launch of niraparib in Europe in the second half of next year; and then with our VARUBI franchise, we have the IV formulation in the prelaunch phase and we intend to launch VARUBI IV in the first half of next year and, as you know, that is the largest part of the market opportunity for VARUBI in the U.S. We already have the oral products, of course, on the market. And then VARUBI oral is under review by EMA, and we intend to launch VARUBI oral in the first half of next year in Europe. And the oral formulation is the largest opportunity there. At the same time, we're working on additional strategies relative to niraparib. We learned a lot from the NOVA study, and we'll take those learnings and apply it to a broader development program.

And in addition, the immuno-oncology platform is moving forward with our anti-PD-1 antibody in the clinic. We'll establish our dosing schedule by year-end and our TIM -- anti-TIM-3 antibody is also in the clinic. So we'll have some data points coming forward next year. So over the next 12 months or so, we anticipate 4 launches in the U.S. and in Europe, and clinical data, obviously, around our immuno-oncology pipeline and additional trial strategies being implemented for niraparib. And we finished up the third quarter with almost $650 million in cash, so we're well-positioned to take this forward.

**Alethia Rene Young**
*Crédit Suisse AG, Research Division*

Great. So I mean, those are PARP expansion. I guess, that's where I get the most questions right now, like, life post-ovarian. And I guess, first of all, do you think that all these PARPs are created equal? Kind of we've seen different safety profiles emerge. Kind of the efficacy, it's a little bit hard to tell in my eyes. But maybe you can give us your perspective and frame that as we think about going into kind of different indications beyond ovarian?

**Mary Lynne Hedley**
*Co-Founder*

Sure. So I'll hopefully hit all of them, but starting just with are all PARPs created equal. I think at this point, the clinical data are the most informative. And we are the only ones out there currently with a randomized Phase III pivotal study in a broad patient population. So there are competitors, of course, who

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

are studying PARP inhibition in the ovarian cancer study and primarily in patients with BRCA mutations. So they haven't taken the opportunity, didn't believe enough in the data they had originally to be able to move into an expanded patient population. If we're successful at getting the label that we hope to get as we seek to get approval of niraparib, that's a very broad label for our platinum-sensitive, recurrent ovarian cancer in response to platinum. And we don't think other people's clinical data will, in fact, be able to support such a label. So at this point, I think the clinical data speaks volumes and we're ahead of the pack. And based on the horizon of what we see, that should, in fact, be the case for quite some time. So how do we take that information and expand it into other types of tumors? What we learned from NOVA was really the best biomarker is response to platinum. I mean, everybody who came into the study had that single unifying factor. So if we think about what tumor types are treatable with platinum today, clearly, lung cancer, head and neck cancer, bladder cancer. These are all very large indications that potentially, if we can move into a maintenance setting, are amenable to PARP inhibition. So we'll look forward to expanding next year into indications, some which -- of which will include and, in particular, we're looking at a lung cancer indication right now. One of the other things that we think about and we set ourselves up well to do this is combination. So when we look at the combination studies that we have ongoing with our -- with PD-1, so our TOPACIO trial. And then we also have an AVANOVA trial, which is in combination with Avastin. And the reason we started those trials so early was because we obviously see Avastin is used many places. And if we look at PD-1s, the application of those 2 broad range of tumor types is quite evident. So we can demonstrate that niraparib plus PD-1 for example in triple negative breast or recurrent ovarian cancer is beneficial, will not only expand the ovarian cancer franchise, but have a great launching platform to move into other tumor types, again, such as triple negative breast, lung and bladder and all the other ones I already mentioned where niraparib may, in fact, be useful.

**Alethia Rene Young**
*Crédit Suisse AG, Research Division*

And so as far as the expanding ovarian population, have you guys kind of put numbers or thought about like how many patients that could potentially add as we move forward with either a PD-1 and PARP combo or if you look at the Avastin trial as well in combination? Are there any kind of hard numbers to help people think about those?

**Leon O. Moulder**
*Co-Founder*

I think we've described the patient populations that are targeted today based on the NOVA results. And what the opportunity could be -- and I'll let Mary Lynne jump in here, is that the PD-1 combo isn't platinum-sensitive. It's a platinum-resistant population. So that does allow broadening if we go towards a platinum-resistant disease. Now these are patients that have had a platinum response along the way, but they haven't met the definition of true platinum sensitivity in ovarian cancer which is at least 6 months of duration. And each time a patient receives a platinum regimen, the duration of benefits shrinks. So over time, more and more patients are platinum-resistant and it's that population that allow for a broader market opportunity in later lines of therapy over time.

**Mary Lynne Hedley**
*Co-Founder*

I think one of the things that's so powerful, I think, about what we have in terms of setting ourselves up for expansion is that I mentioned, for example, using platinum responsiveness is one way to target patients for application of niraparib in a sort of maintenance that, in fact, you get your platinum. We know a significant percentage of patients, as an example, lung cancer respond, but then they stopped platinum treatments. So those would be eligible. But thinking even more broadly, to Lonnie's point, if we go to first line, so we now know based on the KEYTRUDA data, PD-1s may be relevant in a significant number of lung cancer patients in the first line. If we can demonstrate in the TOPACIO trial, the benefit of niraparib plus PD-1, one could envision quite easily a PD-1 versus PD-1 niraparib trial in first 9 months. So there are multiple places for us to play based on what we've set ourselves up for in these combination trials without relying on chemo combos, which have always been challenging with PARP inhibitors. And I think it's a matter of, at least, over the next year seeing that data come to fruition and then, I think, it's quite simple

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

leaping to what trials we might try. So I'm not going to answer your question directly because there's just many possibilities of where we could go with these combinations.

**Alethia Rene Young**
*Crédit Suisse AG, Research Division*

I hear you. One of the questions I've gotten from experts maybe is like around duration of PARPs. And will doctors be comfortable using it out to how long you've seen benefit in BRCA even in HRD-positive? Like, how do you guys think about that? And what's the education process there?

**Mary Lynne Hedley**
*Co-Founder*

Right. So we've had cases that are on the NOVA trial now 39 months. I think it's the longest one. So from, obviously, the very beginning when we started the trial and thus far based on our data and based on the data from other PARP inhibitors in the field. Long-term use of PARP inhibitors is tolerable and certainly does not lead to an increase in what some people were originally concerned about which would be secondary malignancies. So in the NOVA trial and in other trials, where PARP inhibitors have been tested, people haven't that there's an imbalance in the secondary malignancies as a result of long-term PARP treatment. So as long as the patient is benefiting, it would seem based on the data that we have currently appropriate to continue treating those patients. And so far, we haven't had pushbacks on physicians or patients in that regard.

**Alethia Rene Young**
*Crédit Suisse AG, Research Division*

Okay. And I guess, prostate, which is a popular one right now. I guess, maybe, Lonnie, can you talk a little a bit about why the decision you made last year to partner prostate? And then maybe Mary Lynne, you can talk about maybe the confidence that we should or should not have in the indication kind of even with the antigens?

**Leon O. Moulder**
*Co-Founder*

So when we outlined our own strategic development plan for niraparib, we had prostate prioritized below a few of the tumors that Mary Lynne just mentioned. And our own plan is call for an internal launch sometime into the 2020s, and J&J, Janssen had approached us. And of course, you are quite familiar with the large prostate cancer franchise they have globally and the clinical trial network they have globally. It's a machine how they can run through prostate cancer trials and suggested that they could accelerate that. We spent a lot of time talking about it, clearly understood their capabilities. Obviously, they've already demonstrated what they're able to do now that they're into clinical trials and prostate cancer. But to take the economics that we would ultimately receive if we brought prostate cancer alone, if we did it on our own, take those economics and bring them back to us now. So between the upfront development milestone payments that we're going to receive, we're getting the value of the prostate indication much sooner than we would have otherwise been able to accomplish on our own. And with our cost to capital at the time, obviously, it made a lot of sense from us -- for us economically and it makes sense to get it to patients quicker. And over the long term, of course, we're going to get commercial milestones based on sales achievement, a royalty, et cetera. So it just made a lot of sense on a lot of fronts, and we're focusing our activity in other tumors and they're doing a great job, of course. The timing they believe we'll have the first submission by 2019. So we would not have been able to do that.

**Mary Lynne Hedley**
*Co-Founder*

They've been cunningly fast to actually initiate the clinical trials, and hats off to them. They've really embraced the program. They're -- they've been great to work with and they've already dosed the patients in there in their first trial as they publicly stated. So we're very excited to be able to get niraparib into a broader patient population. And the data that so far exists with PARP inhibitors in that particular setting indicates, of course, that PARP inhibitors may be effective in a broader range of mutations than originally

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

we're seeing at least in ovarian cancer. There's a panel of multiple genetic mutations that they are looking to select patients. And then as it relates to antigen receptor antagonists, they are the concept similar to what it is with things like Avastin, for example, or a PI-3K inhibitor and AKT inhibitor and EGFR inhibitor, and that is to create synthetic lethality. So using our CDK inhibitor -- using a combination -- kind of relying on the genetics of the tumor as it is, you can create synthetic lethality in a tumor using 2 different agents together in combination, and do so without the overlapping myelosuppression that we see with chemotherapy which has always been what's limited that combination. So I think there's a great -- it just really -- again, it gets to -- I think niraparib has -- right now is positioned to have a great platform upon which to just move into combination settings, which will expand the tumor types and the lines of therapy that we can address even within ovarian cancer.

**Leon O. Moulder**
*Co-Founder*

And just one other thing, I was describing the actual structure for the relationship. And an important point, because I get this question a lot and I'm not sure if you do, Alethia. But the way we manage the commercialization, we control the product. We distribute the product even for prostate. We set price so the product is in our hands. We share it with them in a way that they book the prostate revenue, but it's really our products in the marketplace.

**Alethia Rene Young**
*Crédit Suisse AG, Research Division*

Great. And I want to do IO at least for a good 8 minutes. So I got 2 minutes to ask this question, which is international expansions. So Europe beyond, like, is this a feat that you guys can take on? How do you think about kind of scaling the business there?

**Leon O. Moulder**
*Co-Founder*

I think we're quite enthusiastic about the possibilities here. Obviously, for us, VARUBI alone would not have been really an economically sensible thing to do in Europe. VARUBI itself can pretty much cover, over time, all of our expenses. So from that point forward, anything else we put into the sales force is really economic leverage. And with the NOVA results -- and remember, NOVA, the primary investigator is from Europe. ENGOT was our partner for the trial. ESMO was where the data was first presented. So there's great enthusiasm in Europe for niraparib. And obviously, we're going to leverage that. But we already have our headquarters operation in place outside of Zürich and Zug. Some years ago, we migrated our intellectual property offshore so that any future ex-U.S. revenue would go through a more favorable tax jurisdiction. And now, we've completed that with the establishment of the Zug office. And then we have 5 regions that cover 17 countries. Those 5 regions are based in the 5 largest countries in Europe. We have our general managers and our medical directors in place. And we have a head of Europe overall that's deeply experienced, have a long career with Amgen, running multiple countries, running the Neupogen franchise for all of the earth at one point in time. Just a fantastic team, and it's really about having the right team in place. We've been involved in European commercialization in the past, but ultimately, you want people in the ground that are knowledgeable, deeply experienced and can get the job done. What's been quite gratifying is following the NOVA data, the amount of people from other companies -- leading companies that are sending us their resumes, and we want to be part of the launch of TESARO in Europe. So there's a lot of enthusiasm. By year-end, we'll have about 125 people or so, and that will allow us to fully cover the audiences for both VARUBI and niraparib in ovarian cancer. And that's about the size of our U.S. commercial and medical organization now. About 125, 130. In the U.S., we're adding about 50 people. That's it. That's -- we just need to about 50, about 30 in the field, another 20 all around commercial and medical to fully launch VARUBI IV and importantly, niraparib, and then we're set.

**Alethia Rene Young**
*Crédit Suisse AG, Research Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Great. So maybe we'll go onto IO. I thought I understood IO. Now I really don't understand IO. So maybe you guys can talk about what -- I mean, start off with the big picture of how to compete in a world that's ever changing with IO and also very, very competitive.

**Mary Lynne Hedley**
*Co-Founder*

Yes. So I got -- I'm somewhat biased because I'm an immunologist by training so I always tell people you can't learn immunology by reading a textbook, which a lot of people I think, think it's a very nuanced field. So obviously, PD-1s are -- I don't have to say this, everyone knows it and they're everywhere. But the question -- the next question, of course, and I'd say this here is, combinations and which ones make sense. And I guess if you go back to just the fundamental tenets of how did we even get to PD-1 and all these targets out there, turn on the brakes, turn off the brakes. And so where do you go next? And I go right back to what did we learn fundamentally as immunologists that got us to, frankly, about 10 years ago, thinking about PD-1 is the target. And we learned a lot of this, and I redirect everybody back to kind of viral infections. That's where these targets first became evident, that they were associated with disease that was rapidly progressing and were associated with chronic diseases. And we knew that if you took the T-cells out of those patients, they were not able to do -- kill that virally infected cells. That was then expanded into the tumor space, which is very similar to a common viral infection. It's a chronic exposure to antigen. It's chronic exposure, which ultimately results in upregulation of PD-1 and what else? And that's where we play. So if we start -- well, what else happened in those kind of viral infections? What else happens in tumors? We -- and not -- let's not look at the blood. Let's look in the tumors. And that's what -- because that's where all the action is and that's what's really relevant. One thing we learned, again, over a decade ago when I started my first immuno-oncology company was, obviously, well before it's time, was that the empiricism by -- that is innate in understanding immuno-oncology, especially if you're looking at blood, doesn't get you anywhere. You have to go right to the tumor. And now we have tools to do that. So if you pull T-cells right out of tumors, you can see, similar to a chronic viral infection setting, that there is upregulation, not just PD-1, but other checkpoints such as TIM-3 and LAG-3. And then if you block -- and those were exhausted T-cells. And actually, exhaustion occurs. It's temporal. Over time, the cells become more and more exhausted. So first, they lose proliferation. Then, they lose IL-2. Then they lose gamma interferons. And all of this, of course, is happening in the context of continued chronic antigen stimulation. So if we block with PD-1, we can reactivate the cells, they proliferate, they secrete IL-2. But over time, when TIM-3 comes up, TIM-3 trumps PD-1. You can have antibodies to PD-1 on the surface of those, too, if you could the pull them out of this published [ph]. Pull them out of patients, you can see antibodies and antibody PD-1 treated patients, they're stuck to those T-cells, but the T-cells are not doing anything. They're exhausted and they inspect TIM-3 and/or LAG-3. And now if you add a TIM-3 antibody, you can reactivate them. So -- and in mouse models, you can reactivate them and they'll kill tumors. So that to me, I mean, those are the kind of data that we look for to say what's the next best target. Not just here's a list of 15 turn on and 15 turn off, and let's just empirically start mixing them all together and see what works. That never ever work. In immunology, 10 years ago, it didn't work. I don't think it's going to work today. I think you have to follow the science, read the literature, really understand it and then apply what we've learned. I mean, it sounds simple. But apply what you've learned clinically, and I think we'll start to see advantages in these combinations if that approaches you as opposed to simply -- we have all this money, and we're really in a hurry. And so let's just do 1 million trials and one of them will hit, which I kind of think is a little bit of what's going on right now. But we don't have that luxury, if you want to call it that. And I don't believe that's the best thing for the field of our patients, ultimately. If you're going to ask a patient to be on a trial, it is your ethical responsibility to make sure that you have a solid rationale for putting that patient on a trial. And frankly, for shareholders, too, because why should we spend that money if there's not really a good solid reason. And we don't have -- need to have all $650 million. We don't have the checkbook of some of these bigger companies to be able to support those trials. So we have to be very smart and deliberate about what we do. And so that's how we approach it. Does that help?

**Alethia Rene Young**
*Crédit Suisse AG, Research Division*

Very helpful.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Mary Lynne Hedley**
*Co-Founder*

In 5 minutes?

**Alethia Rene Young**
*Crédit Suisse AG, Research Division*

No, we still have time. Are there any questions from the audience? Okay, we're going to -- oh, Jo [ph]?

**Unknown Analyst**

I have to say you've explained the LAG-3 and TIM-3 very eloquently, more eloquently than Novartis do. But Novartis also do exactly the same thing, and have chosen PD-1/LAG-3, PD-1/TIM-3 as their next options for exactly the same reasons yourselves. So they're ahead of you. So how do you close the gap? How do you do things -- you've got some great smart ideas, but you are behind with a lot of this. So how do you speed yourselves up?

**Mary Lynne Hedley**
*Co-Founder*

Okay. So I think we're only behind in terms of the TIM-3 and LAG-3/TIM-3, certainly, only by 3 months, I think, with our last calculation. Because we have our TIM-3 antibodies in the clinic. It's in its multiple dose cohorts expansion program. So I don't think we're that far behind. And the question will be, of course, especially with TIM-3, 2 questions. One is, what has -- there are many cells that TIM-3 might affect. This is one of the reasons I'm so interested in it, so I mentioned T-cells. But there are also effects of TIM-3 on antigen -- presenting cells, dendritic cells, macrophages, all of these other types of immune cells that cause the microenvironment and the tumor to be suppressed. So the question is, can your antibody actually reactivate all of those cells? Can it inhibit T-reg? Can it reactivate the monocytes or suppress the M2s and reactivate the monocytes to differentiate into the M1 phenotype. And could it encourage antigen presentation on APCs? And can it activate the T-cells? Because we know there are multiple ligands on -- that are affected by TIM-3. So we've been able to demonstrate in vitro activation of many of those cell types. And I think that's very important. I don't know what Novartis' antibody does yet. But when we move into the clinic and we hope to see the full ramification of a TIM-3 blockade, we hope that we're able to affect all of those cells. And we've clearly been able to demonstrate that in vitro. The second piece I think about: one, is how good your antibody; two, is which tumor types are you going after and what type of information do you have to lead you to that conclusion? Because PD-1s are kind of everywhere. The fundamental question is what I just said. Do you have enough information about the tumors and the T-cells in the tumors that would lead you to one tumor type or another. Because TIM-3 may not be relevant to all tumor types. So we have quite an extensive database of fresh tumor samples that we've gotten across about 15 different tumor types to help us understand where to place the PD-1/TIM-3 combination. I think that will be very helpful to sort of leap frog us in the TIM-3 setting. And LAG-3 are -- we're going to file the IND if everything is on track next year -- early next year. And there, again, I think it's having the information available to help understand not just empirically what's tried everywhere, but where would LAG-3 specifically be relevant. And we have those data to help us.

**Alethia Rene Young**
*Crédit Suisse AG, Research Division*

All right. Well, we're out of time. So thanks, Mary Lynne. Thanks, Lonnie.

**Mary Lynne Hedley**
*Co-Founder*

Sure.

**Leon O. Moulder**
*Co-Founder*

Thank you, Alethia.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Mary Lynne Hedley**
*Co-Founder*

Thank you, Alethia.

**Leon O. Moulder**
*Co-Founder*
Thank you, everyone, for joining us.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**TESARO, INC. COMPANY CONFERENCE PRESENTATION |  NOV 08, 2016**

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.