UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| LSI DESIGN AND INTEGRATION CORP., Individually and On Behalf of All Others Similarly Situated, ) ) ) ) ) | |   |
| Plaintiff, ) ) | |   |
| v. ) ) | | Civil No. 18-cv-12352-LTS |
| TESARO, INC., LEON O. MOULDER, JR., ) and TIMOTHY R. PEARSON, ) ) | |   |
| Defendants. ) ) | |   |

ORDER ON MOTION TO DISMISS THE AMENDED COMPLAINT (DOC. NO. 23)

November 13, 2019

SOROKIN, J.

This class action case, brought by and on behalf of Lead Plaintiff LSI Integration Corporation ("LSI") and other similarly situated holders of common stock of Defendant Tesaro, Inc. ("Tesaro"), alleges that Tesaro and two of its officers, Defendants Leon O. Moulder, Jr. and Timothy R. Pearson,[1] made materially false statements that misled investors in violation of Section 10(b) of the Securities Exchange Act ("the Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 CFR § 240, 10b-5, as well as Section 20(a) of the Exchange Act, 15 U.S.C. § 78t. Doc. No. 22. The Defendants filed a joint Motion to Dismiss LSI's Amended Complaint. Doc. No. 23. For the following reasons, the motion is ALLOWED.

---

[1] Defendants Moulder and Pearson served as Tesaro's CEO/Director and CFO/Executive Vice President, respectively, during the class period.

I.    THE AMENDED COMPLAINT'S ALLEGATIONS[2]

   A.    Factual Allegations

Tesaro was an oncology-focused biopharmaceutical company that identified, acquired, developed, and commercialized cancer therapies and oncology supportive care products in the United States and Europe. At the time of the class period—November 4, 2016 to November 14, 2016—Tesaro had commercialized only one U.S. Food and Drug Administration-approved drug: an oral formulation of a drug it called Varubi. Intended to prevent nausea and vomiting associated with chemotherapy administered to treat cancer patients, Varubi generated $5.174 million in sales for Tesaro during 2016. In addition to its Varubi sales, Tesaro relied on $1.4 billion in proceeds from public offerings and private placements of common stock and convertible preferred stock, including $408.9 million raised from a secondary offering of common stock in July 2016.

However, while Tesaro experienced an influx in investor support in 2016, LSI contends that Varubi sales were not as robust as the company hoped. According to one confidential witness who was responsible for sales of Varubi in California during the class period, Tesaro

---

[2] The Court accepts the Amended Complaint's factual allegations as true and draws all reasonable inferences in LSI's favor. Saldivar v. Racine, 818 F.3d 14, 16 (1st Cir. 2016). Unless otherwise noted, all facts are recited as set forth in the Amended Complaint. Additionally, Defendants submitted complete versions of the SEC filings, communications, and presentations that LSI references in its Amended Complaint. Doc. Nos. 24-1–24-4. While ordinarily "any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden . . . courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; [and] for documents sufficiently referred to in the complaint." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). SEC filings and undisputed communications referenced in the Amended Complaint are the sorts of documents courts routinely consider at the motion to dismiss stage. See, e.g., Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 232 n.2 (1st Cir. 2015). Accordingly, the Court will consider the submitted exhibits where indicated.

missed its national sales goal for Varubi sales in both the second and third quarters of 2016, selling 53% and 67% of its targeted sales, respectively.[3] These internal shortcomings, according to a second confidential witness, were discussed by Tesaro corporate leadership on a monthly basis. This second confidential witness also avers that Tesaro leadership, including Defendants Moulder and Pearson, "never expected the oral formulation of Varubi to drive [Tesaro's] revenue," given that Varubi sales had not matched the company's internal goals. Doc. No. 22 ¶ 37.

Against this backdrop, Tesaro and its leadership made three statements that LSI claims were materially false and misleading. First, on November 4, 2016, Tesaro filed a Form 10-Q quarterly report with the SEC,[4] which included statements about Tesaro's financial condition:

> We will require additional capital for the continuing commercialization of VARUBI, further development and potential commercialization of our other product candidates, including any license payments or milestone obligations that may arise, required costs relating to our research collaborations, and cash interest obligations related to our Convertible Notes. We may also need additional funds to pursue our strategy of in-licensing or acquiring additional product candidates and to meet our obligation to repay the Convertible Notes at maturity or, at our election, upon conversion. Our balance of cash and cash equivalents as of September 30, 2016, and the cash we expect to generate from sales of VARUBI, are expected to be sufficient to meet our existing cash flow requirements and fund our existing operations at their currently planned levels through at least the twelve months following the filing of this Quarterly Report on Form 10-Q.[5]

---

[3] According to the confidential witness, the Company sold 4,481 units of Varubi in the second quarter of 2016 compared to a national sales goal of 7,705 units; in the third quarter of 2016, Tesaro sold 5,103 units of Varubi compared to a national sales goal of 7,594 units.

[4] The Form 10-Q was signed by Defendants Moulder and Pearson in their capacities as CEO and CFO/Executive Vice President, respectively.

[5] While not included in the Amended Complaint, the Court notes that during the 10-day period following the filing of Tesaro's Form 10-Q, its "stock rose from $121.14 to $148.50." Doc. No. 25 at 5; see also Wang Yan v. ReWalk Robotics Ltd., 330 F. Supp. 3d 555, 563 (D. Mass. 2018) (noting that courts may take judicial notice of publicly traded stock prices).

Second, on November 8, 2016, Defendant Moulder gave additional remarks about Tesaro's financial condition at the Credit Suisse Annual Healthcare Conference in Scottsdale, Arizona:

> [O]ver the next 12 months or so, we anticipate four launches in the U.S. and in Europe and clinical data, obviously, around our immuno-oncology pipeline and additional trial strategies being implemented for niraparib. And we finished up the third quarter with almost $650 million in cash. So we're well positioned to take this forward.

Finally, at the Credit Suisse conference, Defendant Moulder made the following statement about the prospect of scaling Tesaro's business in Europe:

> VARUBI alone would not have been really an economically sensible thing to do in Europe. VARUBI itself though can pretty much cover over time all of our expenses. So, from that point forward, anything else we put into the sales force is really economic leverage.

Less than a week after Defendant Moulder's statements, on November 14, 2016, Tesaro announced in a press release that it would commence an underwritten public offering of 1,750,000 shares of its common stock and filed a prospectus for said offering with the SEC. The next day, after a national biotech columnist reported that there was "light demand" for Tesaro's stock offering, Tesaro announced in a second press release that it had priced its shares of its common stock at an offering price of $135 per share, about 9% lower than the closing price of Tesaro stock on the previous day. In the wake of these announcements, Tesaro's share price continued to decline, closing at $126.65 per share on November 16, 2016. Given this precipitous decline in the market value of Tesaro's securities, LSI avers that class members "suffered significant losses." Doc. No. 22 ¶ 54.

B.     Legal Allegations

First, LSI claims the Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by making misleading statements in furtherance of a scheme to deceive the investing public and artificially inflate the market price of Tesaro. Second, LSI contends that Defendants Moulder and Pearson violated Section 20(a) of the Exchange Act because they exercised control over Tesaro during the time that Tesaro and its officers allegedly violated Section 10(b).

II.     LEGAL STANDARD

Faced with a Rule 12(b)(6) motion to dismiss a securities fraud claim, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). However, "Congress has raised the standard of pleading for Section 10(b) and Rule 10b-5 securities fraud claims." City of Bristol Pension Fund v. Vertex Pharm. Inc., 12 F. Supp. 3d 225, 234 (D. Mass. 2014); accord Local No. 8 IBEW Ret. Plan v. Vertex Pharm. Inc., 140 F. Supp. 3d 120, 129 (D. Mass. 2015), aff'd sub nom. Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharm., Inc., 838 F.3d 76 (1st Cir. 2016). Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), when a plaintiff alleges a material misrepresentation or omission of a material fact, the complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)-(2). To qualify as "strong," "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314. In assessing whether scienter has been properly alleged, a court must "look[] at the complaint as a whole." New

Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35, 45 (1st Cir. 2008). It "must weigh not only inferences urged by the plaintiff but also competing inferences rationally drawn from the facts alleged." Id. "If there are equally strong inferences for and against scienter, then the tie goes to the plaintiff." Local No. 8, 140 F. Supp. 3d at 130 (citing New Jersey Carpenters, 537 F.3d at 45).

    A.    Section 10(b)/Rule 10b-5 Claim

Count I of the Amended Complaint alleges violations of SEC Rule 10b-5, promulgated pursuant to Section 10(b) of the Exchange Act. SEC Rule 10b-5 prohibits, "within the context of the purchase or sale of any security," the employment of "any device, scheme, or artifice to defraud;" the issuance of "any untrue statement of a material fact or [omission] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;" or the engagement "in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5. To prevail on a claim under SEC Rule 10b-5, a plaintiff must show: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008).

    B.    Section 20(a) Claims

Count II of the Amended Complaint alleges violations of Section 20(a) of the Exchange Act ("Section 20(a)"), 15 U.S.C. § 78t. Doc. No. 22 ¶¶ 74–79. Section 20(a) provides that "[e]very person who, directly or indirectly, controls any persons liable under [the Exchange Act] shall also be liable jointly and severally" unless "the controlling person acted in good faith." Id.

§ 78t(a). Liability under Section 20(a) requires a "primary violation." Aldridge v. A.T. Cross Corp., 284 F.3d 72, 84 (1st Cir. 2002).

III. DISCUSSION

The Court first considers the three statements that LSI alleges are false or misleading. Then, the Court considers whether LSI's Amended Complaint alleges facts that raise a "strong inference" of scienter, as demanded by the PSLRA's "rigorous pleading standards." Whitehead v. Inotek Pharm. Corp., No. 17-CV-10025-LTS, 2018 WL 4732774, at *4 (D. Mass. June 27, 2018) (quoting Corban v. Sarepta Therapeutics, Inc., 868 F.3d 31, 37 (1st Cir. 2017)).

    A.    Tesaro's Form 10-Q Statements

LSI alleges that Tesaro's November 3, 2016 Form 10-Q was false and misleading because: (1) Tesaro allegedly "knew it was in trouble" after missing internal sales goals, Doc. No. 25 at 5; and (2) the Form 10-Q "falsely assured investors that [Tesaro] had adequate cash to fund [its] existing operations for the next twelve months based on the existing cash and cash expected to be generated from Varubi," thus "represent[ing] to the market that there would not be another [stock] offering in the near term." Id. at 9. Drawing all reasonable inferences in LSI's favor, the Court concludes that the Amended Complaint does not plausibly allege that the Form 10-Q statement is false and misleading.

This is so for multiple reasons. First, on its face, the statement makes no representations about whether Tesaro will conduct additional stock offerings over the next twelve months. In fact, the statement excerpted by LSI explicitly emphasizes that Tesaro "will require additional capital" for further development and commercialization efforts. Doc. No. 22 ¶ 39. Moreover, an adjacent statement in the Form 10-Q notes: "Unless and until we can generate a sufficient amount of revenue from our products, we expect to finance future cash needs through public or

7

private equity or debt offerings." Doc. No. 24-1 at 33. Indeed, LSI acknowledges in its Amended Complaint that "[t]hroughout its history, [Tesaro] never generated a profit and exclusively relied on more than a billion dollars raised through public and private offerings of common stock and equity." Doc. No. 22 ¶ 2. Far from "assur[ing] investors" that there would be no additional stock offerings in the next twelve months, the plain language of the Form 10-Q placed investors on notice that Tesaro would continue—like "many early-stage bio-tech companies"—to fund its operations and commercialization efforts through public offerings. Doc. No. 24 at 3–4.

LSI's two confidential witnesses provide no meaningful assistance. While the confidential witnesses may provide plausible allegations that Tesaro missed internal sales goals, Doc. No. 22 at 8–9, the Amended Complaint does not explain the connection between these internal targets, Tesaro's plans for procuring additional capital through public offerings, and its overall financial health. Neither confidential witness alleges that Tesaro's failure to meet its internal sales targets caused an unexpected shortage in cash, thus necessitating an additional infusion of capital by way of a public stock offering. Nor do the confidential witnesses allege that demand for Varubi was, in fact, declining, or that Tesaro did not—or could not—reasonably expect to "generate [cash] from sales of Varubi" as its Form 10-Q claimed. Id. at 10; cf. In re Smith & Wesson Holding Corp. Sec. Litig., 836 F. Supp. 2d 1, 14 (D. Mass. 2011), aff'd, 669 F.3d 68 (1st Cir. 2012) (noting that "the failure to meet internal sales goals does not necessarily indicate declining demand for the Company's products.").[6] Indeed, there is no suggestion at

---

[6] LSI relies heavily on In re Smith & Wesson Holding Corp. Sec. Litig., 604 F. Supp. 2d 332 (D. Mass, 2009) for the proposition that a confidential witness account regarding missed internal sales targets is sufficient to plead falsity and survive a motion to dismiss. E.g., Doc. No. 25 at 5 n.2. Smith & Wesson, however, is inapposite. There, the plaintiff specifically alleged that Smith & Wesson's missed internal sales targets coincided with statements indicating a "growth in

8

all—from either of the confidential witnesses or elsewhere in the Amended Complaint—that Tesaro's existing cash and cash equivalents, plus its Varbui sales, would be insufficient to fund the company's operations. Quite the contrary: LSI concedes that Tesaro's ending cash position in 2016 was sufficient to fund its operations for 2017, even "without the funds from the November 2016 offering." Doc. No. 25 at 14 n.3. Thus, LSI's Amended Complaint does not state "reasons why [Tesaro's Form 10-Q] statement is misleading." Tellabs, Inc., 551 U.S. at 32.[7]

        B.        <u>Statements at the November 8, 2016 Credit Suisse Healthcare Conference</u>

LSI's Amended Complaint similarly fails to plead falsity with respect to statements made by Tesaro officers at the November 8, 2016 Credit Suisse Healthcare Conference. First, Defendant Moulder's statement that Tesaro was "well positioned to take this forward" is precisely the type of statement of corporate optimism that courts routinely deem immaterial as a

---

demand" for its products. Id. at 343. Here, on the other hand, LSI points to no accompanying claims about Varubi sales that render the missed internal sales targets material omissions or expose Tesaro's Form 10-Q statements as false or misleading. In fact, Tesaro's allegedly false statements—concerning only its ability to fund its operations—have no apparent connection to missed sales targets.

[7] LSI argues that even with its cash on hand, "Tesaro may have been awfully close to running out of cash." Doc. No. 25 at 14 n.3. This is so, LSI argues, because Tesaro "would burn between $110 to $120 million a quarter in the first half of 2017 and also spend an additional $75 million to meet certain milestone obligations in the same period." Id. Even if it were enough for LSI to show that Tesaro was "awfully close to running out of cash"—which it is not—the record before the Court demonstrates otherwise. In fact, Tesaro's Form 10-Q expressly states that Tesaro "[w]ill require additional capital for," amongst other things, "milestone obligations." Doc. No. 24-1 at 33. Thus, the Form 10-Q statements challenged by LSI can only be read as indicating that Tesaro did not intend to meet its milestone obligations with cash on hand but instead intended to raise capital from the market to cover its milestone payments. In any event, the Form 10-Q disclosed that Tesaro had over $600 million in cash and cash equivalents on hand; plainly, that was more than ample to cover its upcoming expenses for the year, i.e., both the $75 million milestone payment and the up to $120 million per quarter that Tesaro was spending according to LSI.

9

matter of law. See, e.g., Fitzer v. Sec. Dynamics Techs., Inc., 119 F. Supp. 2d 12, 23 (D. Mass. 2000) ("Any statements made by the defendants relating to whether [their company] was 'well positioned' are ultimately no more than nonactionable 'puffing.'"); Suna v. Bailey Corp., 107 F.3d 64, 72 (1st Cir. 1997) ("Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen . . . A reasonable purchaser would know that these statements consisted of optimistic predictions of future potential and would not have been misled by them.") (citation omitted); In re Apple Computer, Inc., 127 Fed. App'x 296, 304 (9th Cir. 2005) ("We have held the following similar statements to be non-actionable puffery: 'We're doing well and I think we have a great future.'").

Additionally, Defendant Moulder's statement that "Varubi itself can pretty much cover, over time all of our expenses" cannot support LSI's claims. That statment falls squarely within the PSLRA's "statutory safe harbor for certain for certain forward-looking statements," including "statement[s] of future economic performance." Smith & Wesson, 604 F. Supp. 2d at 339 (applying 15 U.S.C. § 78u-5). "A forward-looking statement is protected if it: (1) includes a disclaimer regarding risks and the possibility that results will differ from projections; (2) is immaterial; or (3) the executives of the company had no actual knowledge the statement was false or misleading." Id. at 340.

Here, at least two of the three potential alternatives for safe harbor protection are plainly met.[8] First, the context in which the statement was made—responding to a question about

---

[8] Defendant Moulder did begin his presentation by noting that he would "be making some forward-looking statements throughout the discussion," and "refer[ring] people to [Tesaro's] SEC filings." Doc. No. 24-3 at 5. However, courts have held that "[v]ague or boilerplate disclaimers are insufficient to invoke safe harbor protection." Rosenbaum Capital LLC v. Boston Comm. Group, 445 F. Supp. 2d 170, 177 (D. Mass. 2006). Given that Tesaro satisfies the other two alternatives for safe harbor protection, the court need not, and does not, determine

scaling Tesaro's business in Europe—places it wholly apart from the allegations set forth in the Amended Complaint, thus rendering the statement immaterial. Doc. No. 24-3 at 8. Indeed, even if Tesaro's internal sales targets for North America are relevant to statements made by the company or its officers, there can be no doubt that North America sales targets are irrelevant to these statements about Varubi expansion on a different continent. Second, LSI has not pled any facts suggesting that Defendant Moulder's statement relating to Varubi sales "over time" and the company's European expansion was made "with actual knowledge . . . that the statement was false or misleading." In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d 5, 39 (D. Mass. 2016), aff'd, 857 F.3d 34 (1st Cir. 2017). Of course, "[t]he fact that [a company] may have fallen short of some of its sales goals . . . is not, in itself, cause for alarm," Smith & Wesson, 836 F. Supp. 2d at 14, and LSI's allegations provide no evidence to support its claim that missed internal sales goals for the North American market placed Tesaro officers on notice that Varubi could not "pretty much cover over time all of [the company's] expenses" as it scaled its business in Europe. Doc. No. 24-3 at 8. Thus, none of the statements highlighted in LSI's Amended Complaint are false or misleading.

   C.  Scienter

Although LSI's failure to properly allege that the statements at issue were false or misleading is sufficient on its own for dismissal, in an abundance of caution, the Court also addresses LSI's failure to allege that Tesaro or its agents acted with the requisite state of mind under the PSLRA. "The required state of mind for liability under section 10(b) . . . is referred to as scienter, which the Supreme Court has defined as 'a mental state embracing intent to deceive,

---

whether Defendant Moulder's prefatory statements were sufficient in and of themselves to invoke safe harbor protection.

manipulate, or defraud.'" Greebel v. FTP Software, Inc., 194 F.3d 185, 194 (1st Cir. 1999) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)). The PSLRA's rigorous pleading standards require that a plaintiff allege facts raising a "strong inference" of scienter. See Corban v. Sarepta Therapeutics, Inc., 868 F.3d 31, 37 (1st Cir. 2017). A plaintiff must allege particularized facts that show "either conscious intent to defraud or a high degree of recklessness." ACA Fin. Guar. Corp., 512 F.3d at 58. Under the PSLRA, recklessness "involves . . . an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious the actor must have been aware of it." Brennan v. Zafgen, Inc., 853 F.3d 606, 613 (1st Cir. 2017).

Here, LSI offers no facts that present a "strong inference" that Tesaro or its officers acted with a fraudulent intent. As the First Circuit has noted:

> In cases where we have found the pleading standard satisfied, the complaint often contains clear allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendant officers were aware that they were withholding vital information or at least were warned by others that this was so. No such direct evidence is pled in the complaint here.

In re Bos. Sci. Corp. Sec. Litig., 686 F.3d 21, 31 (1st Cir. 2012). At best, LSI's Amended Complaint pleads facts sufficient to allege that Tesaro and its officers had actual knowledge that the company missed internal sales goals for the North American market over a relatively short period of time. The Court fails to see how this knowledge is indicative of an intent to deceive investors through any of the statements highlighted by LSI, nor does the Court find this knowledge indicative of a high degree of recklessness. Indeed, "[e]ven if the statements at issue were material and false or misleading, the evidence does not support a finding that the defendants knew that the statements would materially mislead the investing public." Geffon v. Micrion Corp., 249 F.3d 29, 36 (1st Cir. 2001); see also Metzler Asset Mgmt. GmbH v.

12

Kingsley, 928 F.3d 151, 163 (1st Cir. 2019).  And a countervailing inference—that Tesaro believed that statements about the sufficiency of its cash and cash equivalents were accurate and that those statements were not intended to foreclose the possibility of an imminent second public offering—is far more cogent and compelling than LSI's inference of fraud and deceit.  See Tellabs, 551 U.S. at 314.  Thus, even drawing all reasonable inferences in LSI's favor, its Amended Complaint has not pled the requisite mental state to survive Tesaro's motion to dismiss.

IV.   CONCLUSION

For the foregoing reasons, Tesaro's motion to dismiss both counts of the Amended Complaint is ALLOWED.[9]

SO ORDERED.

   /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[9] As liability under Section 20(a) requires a "primary violation," Count II of the Amended Complaint falls along with Count I.  Aldridge v. A.T. Cross Corp., 284 F.3d 72, 84 (1st Cir. 2002).

13